UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Crystal Miller, | ) | C/A No. 5:24-4087-JDA-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| vs. | ) | REPORT AND RECOMMENDATION |
| | ) | OF MAGISTRATE JUDGE |
| Acting Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner"), denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") pursuant to the Social Security Act ("the Act"). For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further administrative action.

I.    Relevant Background

A.    Procedural History

This appeal concerns Plaintiff's March 8, 2021[1] applications for DIB and SSI benefits under Title II and Title XVI of the Act, 42 U.S.C. §§ 401-433 in which she alleges a disability onset date of November 25, 2019.[2] Tr. 204-13. Plaintiff's applications were denied initially on January 14, 2022, Tr. 72-73, and upon reconsideration on June 20, 2023, Tr. 82, 101. On July 12,

---

[1] Although the Application Summaries are dated March 30, 2021, Tr. 204-13, based on the Disability Determination Transmittals, Plaintiff's protective filing date for both applications is March 8, 2021, Tr. 72-73.

[2] At the Administrative Hearing, Plaintiff amended her alleged onset date to May 1, 2021. Tr. 41.

2023, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). Tr. 135. The administrative hearing was held on November 16, 2023, before ALJ Brian Garves. Tr. 36-63. On February 22, 2024, the ALJ issued an unfavorable decision, finding Plaintiff not disabled within the meaning of the Act. Tr. 14-29. On February 28, 2024, Plaintiff, through counsel, requested review of the ALJ's decision. Tr. 199-200. On June 5, 2024, the Appeals Council denied Plaintiff's request for review, Tr. 1-5. Thus, the ALJ's decision became the final decision of the Commissioner of Social Security. Tr. 1. Plaintiff brought this action seeking judicial review of the Commissioner's decision in a Complaint filed on July 23, 2024. ECF No. 1.

B.     Plaintiff's Background

Born in November 1980, Plaintiff was 40 years old as of her amended alleged disability onset date of May 1, 2021. Tr. 255. In her March 30, 2021, Disability Report-Adult form Plaintiff indicated that she completed the 12th grade, did not attend special education classes, and had not completed any specialized job training, trade or vocational school. Tr. 260. Plaintiff listed her past relevant work ("PRW") as grocery store cashier (2000-2005), Pizza Hut waitress/manager (2000-2010), gas station manager (2005-2016 on & off), nursing home certified nursing assistant ("CNA") (2012-2016), and self-employed CNA (2017 – Nov. 25, 2019). *Id.* Plaintiff indicated she stopped working on November 25, 2019, because of her conditions which she listed as fibromyalgia; narrowing of the spine and neck; neck and back pain; tingling in hands and feet; arthritis in back, hands, and feet; numbness in arms; blind in left eye/implant in eye; sciatic nerve; anxiety; PTSD; depression; ADHD; and seizures. Tr. 259. Plaintiff indicated that she was 5'6" tall, weighed 240 pounds, and her conditions caused pain or other symptoms. *Id.*

In a Disability Report-Appeal dated February 8, 2022, Plaintiff indicated a change in her medical condition that occurred November 1, 2021. Tr. 280. Plaintiff noted her medical condition was "worse; lots of pain in back and legs; lots of breathing issues since COVID." *Id.* Plaintiff noted

she had also developed new conditions of "breathing issues; Tarsal Tunnel Syndrome." *Id.* Plaintiff indicated a change in her daily activities and noted she was "limited on all daily activities." Tr. 287.

In a subsequent Disability Report-Appeal dated July 18, 2023, Plaintiff indicated changes in her medical conditions as of March 1, 2023, and indicated "eye have gotten worse; lots of bad days; back has gotten worse; depression and anxiety is getting worse." Tr. 291. She also indicated a new medical condition of asthma as of March 1, 2023. *Id.* As to her daily activities, Plaintiff noted that she was "limited on daily activities due to the type of day that she is having." Tr. 296.

C.     The Administrative Proceedings

Plaintiff appeared with counsel and testified at her administrative hearing on November 16, 2023, before ALJ Garves in Columbia, South Carolina. Tr. 36. Vocational Expert ("VE") Kristine Handley also appeared and testified. *Id.* The hearing was conducted telephonically. Tr. 38-39. Plaintiff amended her alleged onset date to May 1, 2021. Tr. 41; 243 (executed agreement to amend alleged onset date).

1.     Plaintiff's Testimony

In response to questions from the ALJ Plaintiff stated she was 5'5" tall, weighed "around 215" pounds, and graduated from the twelfth grade. Tr. 42. Plaintiff confirmed that she was self-employed for a few years as a CNA. Plaintiff testified that in that position she was caring for one person, and she did not know how much she weighed, but stated she had to lift between 75 to 100 pounds. Tr. 42-43. Plaintiff stated that she worked previously for West Oil Company as a cashier and had to lift and carry around 50 pounds. Tr. 43. Plaintiff stated that she had also worked at Heritage House as a CNA and lifted between 50 and 75 pounds; she noted there were mechanical lifts available for use. *Id.* Plaintiff testified she worked at Pizza Hut as a shift manager and manager, and she had to lift and carry 50 to 75 pounds. *Id.*

When asked to describe her back pain, Plaintiff testified that sometimes her arms and feet will go numb, sometimes she has trouble walking, she has pain that radiates from her back to her legs or down her arms, and she stated she always has "a dull aching or sometimes sharp pain and accompanied with muscle spasms." Tr. 44. Plaintiff stated that she sometimes uses a cane. *Id.* Plaintiff testified that she stopped working because she was unable to perform her expected duties, and she was "constantly having to leave because [she] was in so much pain or doctors' appointments." *Id.* Plaintiff testified that her fibromyalgia causes her to have numbness and tingling in her hands or feet that feels like they are asleep. Tr. 44-45. She stated her ability to hold things for a long period of time, or the strength to carry anything over a few pounds is very hard. Tr. 45. Plaintiff stated that she takes Lyrica for her fibromyalgia and, although it does not make it go away, it helps. *Id.* Plaintiff stated that she has fibromyalgia flares, and the frequency of flares sometimes is affected by the weather—sometimes it might be twice a week, and sometimes it might be every day. *Id.* Plaintiff confirmed that she has depression, and some days are worse than others. *Id.* Plaintiff testified that she is taking medication that "helps some" and she is seeing a psychologist whenever she feels the need, and a psychiatrist who she sees once or twice every two months. Tr. 46. When asked about medication side effects, Plaintiff testified that a lot of her medications make her "sleepy and drowsy" and some of them make her thirsty. *Id.* Plaintiff testified that she has migraines "maybe once a month" but they are affected by the weather as well. *Id.* Plaintiff stated that she needs assistance with getting dressed most of the time because of pain with bending over or buttoning her clothes or tying her shoes. Tr. 47. Plaintiff stated that she has problems with personal grooming and sometimes she has to ask her daughter to help with bathing or with brushing her hair. *Id.* Plaintiff testified that she does minimal household chores, and because of her back pain she sometimes is unable to finish tasks. She stated she "can only stand up or sit down for a certain amount of time." *Id.* Plaintiff stated she can sit for 10 to 15 minutes

before needing to stand up. Tr. 47-48. She stated that she can stand or walk for about the same amount of time, but she will have to lean on something to take the pressure off her back. Tr. 48. Plaintiff stated that she drives only short distances, and she cannot drive more than 15 minutes without stopping to get out of the vehicle to stand up for a few minutes. *Id.* Plaintiff stated she goes shopping and she will sometimes use the riding cart, or she uses a buggy to lean on. *Id.*

In response to questions from her attorney, Plaintiff confirmed that Dr. Jeffrey Scharstein is her family doctor who referred her to the neurologist, Dr. Roland Skinner, who diagnosed her fibromyalgia in November 2019. Tr. 49. Plaintiff affirmed that she stopped working in 2019 because of her health problems. *Id.* Plaintiff stated that when she became self-employed the family for whom she worked was a little more flexible regarding her doctors' appointments, but eventually they determined she was unable to perform the job for which they were paying. Tr. 50. Plaintiff testified that she was prompted to file for disability benefits by a rheumatologist, Dr. Docherty, to whom she was referred for treatment by Dr. Scharstein. *Id.* Plaintiff confirmed she started treatment with Dr. Docherty in June 2020, who tried her on different medicines. Tr. 50-51. Plaintiff affirmed that in April 2021 she was referred to a behavioral health counselor as a requirement to continue with pain management treatment. Tr. 51. Plaintiff continued to receive mental health treatment from Dr. Karen Fulwood who she had been seeing since 2018. Tr. 52. Plaintiff testified that she felt it important to continue treatment with Dr. Fulwood for her depression, anxiety, and ADHD. *Id.* Plaintiff confirmed that in 2022 she was referred for weight management treatment, and she had surgery on March 14, 2023. Tr. 53. At the time of her surgery she weighed 248 pounds, and Plaintiff testified that she currently weighed 215, and her weight loss was "at a stall." Tr. 53-54. Plaintiff testified that she has not noticed any improvement in her physical or mental medical conditions since her weight loss. Tr. 54. Plaintiff stated that Dr. Fulwood approved her for the weight loss surgery. Tr. 55. Plaintiff testified that she had an MRI

of her back in September and discussed it with her doctor; she has been referred to a neurosurgeon, but she has not yet gotten an appointment. *Id.* She stated that Dr. Scharstein sent her to get a spinal shot to relieve some of the pain. Tr. 56. Plaintiff testified that she saw an allergist once, but he told her that he could not do anything for her and referred her back to her primary care physician. *Id.* She also noted that she has rosacea and uses a cream for that. *Id.*

### 2.    VE Testimony

After receiving clarification on Plaintiff's work at the pizza restaurant, the VE described Plaintiff's past work as follows: nurse assistant, Dictionary of Occupational Titles ("DOT") code 355.674-014, SVP of 4, generally performed at medium exertional level, actually performed at heavy; cashier-checker, DOT code 211.462-014, SVP of 3, generally performed at light exertional level, actually performed at medium; and waitress/informal, DOT code 31.477-030, SVP of 3, generally performed at light exertional level, actually performed at medium. Tr. 58-59. The ALJ asked the VE to assume a hypothetical individual of Plaintiff's age, education, and relevant past work experience, with the following residual functional capacity:

> She can lift and carry ten pounds occasionally, less than ten pounds frequently. She can sit for six hours in an eight-hour shift. She can stand for two hours and walk for two hours.
>
> She can frequently handle and finger objects bilaterally.   She can occasionally climb ramps or stairs, occasionally climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl.   She can have occasional exposure to moisture and humidity and irritants such as odors, fumes, dust, gases, and poor ventilation.   She can have occasional exposure to hazards such as unprotected heights and moving machinery.

Tr. 59. The VE testified that an individual with those limitations could not perform Plaintiff's past relevant work, but there were other jobs in the national economy that the individual could perform. Tr. 59-60. The VE identified the following exemplar positions: food and beverage order clerk, DOT code 209.567-014, SVP of 2, sedentary exertional level, approximately 15,000 in the national

economy; printed circuit board screener, DOT code 726.684-110, SVP of 2, sedentary exertional level, approximately 6,000 in the national economy; and final assembler, DOT code 713.687-018, SVP of 2, sedentary exertional level, approximately 9,000 in the national economy. Tr. 60. The VE noted that as to the different types of climbing, her testimony was based on her "experience with employers, which gives [her] an opportunity to observe jobs as they're actually being performed in their natural settings." *Id.*

Plaintiff's attorney asked the VE what would be the threshold level of off-task time that an employer would allow, and the VE responded that in her experience "they will tolerate up to ten percent of an hour or six minutes per hour for off task behavior. They do give this in addition to regularly scheduled breaks." Tr. 61. Plaintiff's attorney asked the same question regarding absenteeism, and the VE responded that in her experience employers "will only tolerate one day of absenteeism per month." *Id.*

Plaintiff's attorney had no more questions for the VE, and he gave a brief closing argument. Tr. 61-62. Plaintiff informed the ALJ that she had surgery in August 2018 and has a "prosthetic eye in [her] left eye." Tr. 62. With nothing further, the hearing closed. Tr. 63.

II.    Discussion

    A.    The ALJ's Findings

In his February 22, 2024 Decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through September 30, 2026.

2.    The claimant has not engaged in substantial gainful activity since May 1, 2021, the amended alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3.     The claimant has the following severe impairments: obesity, fibromyalgia (FM), spinal disorder/degenerative disc disease (DDD), asthma, and migraines (20 CFR 404.1520(c) and 416.920(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except the claimant is capable of lifting/carrying/pushing/pulling ten pounds occasionally and less than ten pounds frequently, of sitting for six hours, and of standing/walk[ing] two hours. She can handle and finger objects frequently bilaterally. The claimant can climb ramps, stairs, ladders, ropes, or scaffolds occasionally, and she can balance, stoop, kneel, crouch, or crawl occasionally. The claimant can occasionally work around hazards such as unprotected heights and moving machinery, and in humidity and wetness occasionally. She can also work around dust, odors, fumes, and pulmonary irritants occasionally.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.     The claimant was born on November 30, 1980, and she was 39 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.     The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," where or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 25, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 20-21, 23, 27-29.

B.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for

benefits, who are not of retirement age, who properly apply, and who are "under a disability,"

defined as:

> inability to engage in any substantial gainful activity by reason of any medically
> determinable physical or mental impairment which can be expected to result in
> death or which has lasted or can be expected to last for a continuous period of not
> less than 12 months[.]

42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A).

To facilitate a uniform and efficient processing of disability claims, regulations

promulgated under the Act have reduced the statutory definition of disability to a series of five

sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 461 n.2 (1983) (discussing

considerations and noting "need for efficiency" in considering disability claims).  An examiner

must consider the following: (1) whether the claimant is working; (2) whether the claimant has a

severe impairment; (3) whether that impairment meets or equals an impairment included in the

Listings;[3] (4) whether such impairment prevents claimant from performing PRW; and (5) whether

the impairment prevents the claimant from performing specific jobs that exist in significant

numbers in the national economy. *See* 20 C.F.R. § 404.1520, § 416.920. These considerations are

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or
"Listed impairments") the Agency considers disabling without the need to assess whether there
are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R.
part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. §
404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed
impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R.
§ 404.1520(a)(4)(iii), § 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant
must establish that his impairments match several specific criteria or be "at least equal in severity
and duration to [those] criteria." 20 C.F.R. § 404.1526, § 416.926; *Sullivan v. Zebley*, 493 U.S.
521, 530-31 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on
claimant to establish his impairment is disabling at Step 3).

sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if the claimant can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b), § 416.920 (a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing the inability to work within the meaning of the Act.  42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy.  To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish the inability to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981)*; see generally Bowen*, 482 U.S. at 146 n.5 (regarding burdens of proof).

### 2.      The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner made after a hearing to which he was a party."  42 U.S.C. § 405(g).  The scope of that federal court review is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case.  *See id.*, *Richardson v. Perales*, 402 U.S.

389, 390 (1971); *Walls*, 296 F.3d at 290 (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005); *see also Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (explaining that, "whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high," as it means only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that the Commissioner's conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.        Analysis

Plaintiff alleges the ALJ erred by failing to properly follow SSR 12-2p when evaluating her fibromyalgia, and by failing to adequately explain his evaluation of Plaintiff's non-severe impairments. Pl.'s Br. 2, ECF No. 13.

1.        ALJ's Assessment of Plaintiff's Fibromyalgia

Plaintiff asserts that although the ALJ found she had the severe impairment of fibromyalgia, she failed to evaluate the impairment pursuant to SSR 12-2p. Pl.'s Br. 32. Plaintiff

11

claims the "ALJ never mentions SSR 12-2p so it is unclear whether or not the ALJ understood the unique nature of this impairment." *Id.* Plaintiff argues the ALJ "did not consider the waxing and waning of [her] condition" and "improperly rejected [her] reported symptoms based on a lack of objective evidence." *Id.* at 33-34 (citing *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 97–98 (4th Cir. 2020)). The Commissioner first notes, correctly, that "the ALJ expressly cited and discussed SSR 12-2p, quoting the same language that Plaintiff references in her brief[.]" Def.'s Br. 12. The Commissioner contends that "the ALJ evaluated Plaintiff's fibromyalgia-related limitations based on all the evidence in the record, including Plaintiff's activities, her treatments, and the medical opinions." *Id.* In response to the Commissioner's argument Plaintiff briefly acknowledges the ALJ's reference to SSR 12-2p, but she asserts the ALJ did not consider the waxing and waning nature of her fibromyalgia symptoms. Pl.'s Reply 3, ECF No. 16.

"Although there is no medical listing for fibromyalgia, Titles II and XVI of SSR 12-2p provide[] guidance on how the Commissioner develops evidence to establish that a person has a medically determinable impairment of fibromyalgia, and how to evaluate fibromyalgia in disability claims and continuing disability reviews." *Smith v. Colvin*, No. 2:14-cv-00042, 2015 WL 7571946, at *7 (W.D. Va. Nov. 24, 2015). SSR 12-2p defines fibromyalgia as a "complex medical condition characterized primarily by widespread pain in the joints, muscles, tendons, or nearby soft tissues that has persisted for at least 3 months." SSR 12-2p, 2012 WL 3104869, at *2. SSR 12-2p also explains how the Commissioner considers fibromyalgia in the five-step sequential evaluation process. SSR 12-2p says the following about the RFC assessment: "For a person with fibromyalgia, we will consider a longitudinal record whenever possible because the symptoms of fibromyalgia can wax and wane so that a person may have 'bad days and good days.'" *Id.* at *6.

Here, the ALJ determined at Step Two that Plaintiff's fibromyalgia was a severe impairment. Tr. 20. At Step Three, the ALJ quoted directly the introduction to SSR 12-2p defining

fibromyalgia, the consideration of a claimant's symptoms in finding it to be a medically determinable impairment, and what supports a finding that fibromyalgia precludes a claimant from performing substantial gainful activity. Tr. 22. The ALJ also provided a summary of SSR 12-2p's evidentiary criteria for a finding of disability based on fibromyalgia noting:

> [Fibromyalgia] should be established by an acceptable medical source/licensed physician, as demonstrated by the claimant's personal medical history and a physical examination. The person must demonstrate at least 11 of 18 positive tender points at the following sites: occiput, low cervical spine, supraspinatus muscle, lateral epicondyle, gluteal, greater trochanter, and inner aspect of the knee. Evidence must also show that other disorders, which could cause the aforementioned symptoms, were excluded.

*Id.* The ALJ then concludes, "[h]owever, the medical evidence fails to establish that the claimant's impairments meet or medically equal the criteria of the aforementioned Listing." Tr. 22-23. The ALJ noted:

> The claimant went to HopeHealth Palmetto, from February to August of 2023, for treatment for radiculopathy, neck pain, FM, upper body tender points, and morbid obesity with a body mass index of about 35-44. Examinations showed normal extremity motor strength, a normal gait, unassisted ambulation, and/or normal coordination, with no gross motor function deficits (see pages 4, 7, 11, 19, 23, and 27 of Exhibit 25F).

Tr. 23.

In determining Plaintiff's RFC, the ALJ stated that he considered all of Plaintiff's "symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p." Tr. 23. The ALJ noted that he also considered the medical opinions and prior administrative findings in accordance with 20 C.F.R. § 404.1520c and 416.920c. *Id.* In his discussion of Plaintiff's treatment records he noted she was treated at HopeHealth from June 2020 to April 2022 for myalgia, low back pain, polyarthritis, FM tender points, and obesity; from October 2022 to January 2023 Plaintiff was treated at Prisma Health Pulmonology for asthma;

from October 2022 to June 2023 she was treated at Prisma Health Weight Management Center; and from June 2022 to August 2023 she was treated at HopeHealth Palmetto for lumbar radiculopathy, neck pain, FM, upper body tender points, polyarthritis, chronic pain syndrome, cervical and lumbar tenderness, and morbid obesity. Tr. 25. The ALJ noted that examinations showed normal extremity motor strength, normal gait and unassisted ambulation, clear lungs, appropriate mood and affect, no musculoskeletal deformity, normal coordination, and no gross motor function deficits or cognitive deficits. *Id.*

Due to the effects of Plaintiff's "spinal disorders, obesity, FM, and migraines" he limited her to "doing sedentary work, with postural limitations and with restrictions in exposure to hazards[.]" Tr. 27. The ALJ cited to Plaintiff's other impairments of asthma, right ankle degenerative changes, posterior tibialis tendinosis, and degenerative disc disease of the lumber spine to explain his other RFC limitations. *Id.* The ALJ also cited Plaintiff's reported ADLs noting that Plaintiff

> reported she was able to care for her special needs child that needed more attention, assist with homework, prepare food daily, dress herself (albeit with problems with putting on pants and buttoning), shower (albeit with a chair), drive, shop in stores, use a computer, pay bills, count change, manage funds, spend time with others, read, watch television, listen to audio books, and get along with authority figures or bosses (Exhibit 4E).

*Id.* The ALJ cited to Plaintiff's medical examinations to support her ability to do sedentary work, again citing to reports from HopeHealth from June 2022 to August 2023 showing "normal extremity motor strength, clear lungs, a normal gait, unassisted ambulation, a normal mood and affect, a normal attention span and concentration, and/or normal coordination, with no gross motor function deficits or cognitive deficits (see pages 7 and 14 of Exhibit 22F; and pages 4, 7, 11, 19, 23, and 27 of Exhibit 25F)." *Id.*

The undersigned has reviewed the documents cited by the ALJ contained in Exhibits 22F and 25F. **Page 7** of Exhibit 22F is from a December 7, 2022, two-month follow-up appointment with Dr. Gregory Browning for back pain. The musculoskeletal examination revealed tenderness and the cervical and lumbar spine with limited range of motion. Tr. 824. The neurological examination revealed multiple tender sites on the neck, upper back/torso/chest wall, and no gross motor deficits. *Id.* **Page 14** of Exhibit 22F is from an October 10, 2022, two-month follow-up appointment with Dr. Browning for back pain. The musculoskeletal examination revealed tenderness and the cervical and lumbar spine with limited range of motion. Tr. 831. The neurological examination revealed multiple tender sites on the neck, upper back/torso/chest wall, and no gross motor deficits. *Id.*

Exhibit 25F contains the Progress Notes of doctors at HopeHealth. **Page 4** is from an August 15, 2023, appointment with Dr. Browning for a two-month follow-up for back pain. Plaintiff stated she was not getting enough relief from her current medication, and the doctor added ibuprofen to help with additional pain. Tr. 917. In his musculoskeletal examination Dr. Browning noted Plaintiff was tender at the cervical and lumbar spine with limited range of motion. Tr. 919. His neurological examination revealed multiple tender sites in her neck, upper back, torso, and chest wall, with no gross motor deficits. Tr. 920 (pg. 4). **Page 7** is from an August 11, 2023, follow-up appointment for fibromyalgia with Dr. Jon Docherty and Plaintiff indicated her fibromyalgia was getting worse. Tr. 921-22. When rating her ability and limitations Plaintiff noted "some difficulty" or "much difficulty" or "unable to do" her activities of daily living ("ADLs"). Tr. 922. On a ten-point scale Plaintiff rated her pain in the last two weeks at 9, her general condition at 9, and unusual fatigue at 10. *Id.* On page 7 Dr. Docherty noted in his examination that Plaintiff had normal gait, full range of motion but positive trigger points in her cervical and lumbar spine, and hips. Tr. 923. He also indicated his neurological exam showed normal motor strength in her upper

and lower extremities and normal coordination. *Id.* **Page 11** is from a June 20, 2023, follow-up appointment for back pain with Nurse Practitioner ("NP") Carol Ann Berry and Plaintiff reported she was stable on her current medication therapy of hydrocodone-acetaminophen and tizanidine HCL. Tr. 925. On page 11 Plaintiff reported continuous pain with average severity of 7/10, that was improved with heat. Tr. 927. The general musculoskeletal examination noted normal gait without use of an assistive device. *Id.* Plaintiff was found to have moderately restricted range of motion in her cervical spine with pain, and reduced range of motion in her lumbar spine with pain on extension and rotation. Tr. 928. **Page 19** is from an April 6, 2023, Progress Note for a two-month follow-up for back pain with Dr. Browning. The musculoskeletal examination indicated tenderness at the cervical and lumbar spine with limited range of motion; the neurological examination reported multiple tender sites on the neck, upper back/torso/chest wall with no gross motor deficits. Tr. 935. **Page 23** is from a February 10, 2023, fibromyalgia follow-up appointment with FNP Pansi Patel. Plaintiff reported she was tolerating the Lyrica medication without side effects, has a lot of muscle soreness/tenderness between shoulder blades, has joint pain in ankles and knees, has muscle spasms in lower back but medication helps some. Tr. 938. Plaintiff reported "some difficulty" or "much difficulty" in her ability to perform ADLs, and noted she is unable to take a tub bath. *Id.* She reported her pain for the last two weeks at 8 on a 10-point scale, her general condition was a 7, and unusual fatigue was 5. Plaintiff indicated that she felt worse compared to the last time she was there. *Id.* The rheumatology examination indicated tenderness and muscle spasms at the cervical spine, muscle spasms at the lumbar spine, bilateral lower extremity edema, and otherwise normal range of motion and no pain in other joints. Plaintiff had 14 fibromyalgia tender points and was ambulating well. Tr. 938-39. **Page 27** is from a February 7, 2023, follow-up appointment for back pain with NP Berry. The general examination revealed normal gait

without use of an assistive device, moderate tenderness in the cervical and lumbar spine with restricted and reduced range of motion and pain with extension/rotation. Tr. 943.

In *Arakas v. Commissioner*, 983 F.3d 83 (4th Cir. 2020), the Fourth Circuit recognized that "[f]ibromyalgia symptoms are entirely subjective [and t]here are no laboratory tests for the presence or severity of fibromyalgia." *Arakas v. Commissioner*, 983 F.3d at 91. Indeed, "[p]hysical examinations [of patients with fibromyalgia] will usually yield normal results—a full range of motion, no joint swelling, as well as normal muscle strength and neurological reactions." *Id.* at 96 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108–09 (2d Cir. 2003)). Accordingly, "ALJs may not rely on objective medical evidence (or the lack thereof)—even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of fibromyalgia . . .. If considered at all, such evidence—along with consistent trigger-point findings—should be treated as evidence *substantiating* the claimant's impairment." *Id.* at 97–98 (emphasis in original).

The Commissioner argues that this case is different from *Arakas* because the ALJ properly considered objective testing as one of many factors in evaluating Plaintiff's symptoms "without placing undue emphasis on objective medical evidence or requiring objective proof of pain or other symptoms." Def.'s Br. 13. The Commissioner asserts that "[t]o the extent the ALJ considered objective medical evidence in evaluating fibromyalgia, he did so only to *substantiate* (not discount) Plaintiff's fibromyalgia-related statements, making this case fundamentally distinguishable from *Arakas*." *Id.* at 15 (emphasis in Def.'s Br.). The Commissioner notes that Plaintiff failed to identify any treatment notes overlooked by the ALJ. *Id.* at 17. The Commissioner states that the ALJ did not ignore the waxing and waning nature of fibromyalgia but he "specifically pointed out" Plaintiff's testimony regarding chronic pain and her complaints of "numerous symptoms at various appointments" including neck and back pain and fibromyalgia

17

tender points, along with his noting instances when Plaintiff reported she was doing well or did not report any pain or other symptoms. *Id.* at 18.

The issue is whether there is substantial evidence to support the ALJ's decision that Plaintiff retains the RFC to perform basic work activity. The ALJ's consideration of Plaintiff's fibromyalgia is not entirely clear. When he first discusses SSR 12-2p and outlines the Ruling's requirements, the ALJ's conclusion that Plaintiff's impairments do not meet a Listing does not explain why. The ALJ notes that Plaintiff was treated for fibromyalgia and other impairments, but he does not explain if these other disorders were excluded from the fibromyalgia analysis. Nor does the ALJ address the Ruling's requirement regarding tender points other than noting that Plaintiff went to HopeHealth Palmetto for treatment of several ailments including "upper body tender points." Tr. 23. While the ALJ referenced the objective evidence in making his RFC assessment, it is unclear if he relied on the objective evidence as it relates to Plaintiff's fibromyalgia specifically, or if he considered the objective evidence as it related to Plaintiff's other impairments, either singly or in combination. The ALJ found that Plaintiff's "exams evidenced the claimant was basically able to physically and mentally function and to do sedentary work." Tr. 27. However, of the eight records cited by the ALJ to support his findings, only two of the records were specific to Plaintiff's fibromyalgia. One is a February 10, 2023, fibromyalgia follow-up appointment with a nurse practitioner whose rheumatology examination, in addition to some normal findings, indicated tenderness and muscle spasms at the cervical spine, muscle spasms at the lumbar spine, bilateral lower extremity edema, and 14 fibromyalgia tender points. Tr. 938-39. The other record is an August 11, 2023, fibromyalgia follow-up appointment with her rheumatologist who noted positive trigger points in Plaintiff's cervical and lumbar spine, and hips. Tr. 921-23. In referencing all of these records, including the two fibromyalgia records, the ALJ notes only the reports of normal findings, but does not refer to the clinical findings in the reports

of Plaintiff's pain, spine tenderness, or reduced ranges of motion. When looking at the ALJ's decision as a whole it is possible, as the Commissioner argues, that the ALJ recognized that Plaintiff's symptoms may wax and wane. However, the ALJ appears to consider only Plaintiff's positive findings. Proper consideration of Plaintiff's fibromyalgia complaints could possibly impact her RFC and shed light on the limiting effects and severity of her condition. Because the undersigned is unable to determine if the ALJ sufficiently accounted for Plaintiff's fibromyalgia pain and fatigue in his RFC assessment, remand is recommended so that the ALJ can build a logical bridge between the evidence and his conclusions. *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016); *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015). The undersigned is "mindful that it is the Commissioner's duty to weigh the evidence and that in some circumstances fibromyalgia can be a disabling impairment while in other circumstances people with this condition are not disabled from working." *Sarcinella v. Berryhill*, No. 8:16-CV-1216-MGL-JDA, 2017 WL 1710948, at *16 (D.S.C. Apr. 21, 2017), *report and recommendation adopted,* No. CV 8:16-1216-MGL, 2017 WL 1542059 (D.S.C. Apr. 28, 2017). Upon remand the ALJ should provide a more detailed explanation of his consideration of Plaintiff's fibromyalgia symptoms under the analysis set forth in SSR 12-2p and the Fourth Circuit's decision in *Arakas* and the effect, if any, on Plaintiff's ability to sustain the demands of competitive employment. *Mascio*, 780 F.3d at 636 (holding that "[r]emand may be appropriate ... where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review.") (internal citation omitted).

2.    Step Two Analysis: Non-Severe Impairments

Plaintiff argues that despite evidence of her anxiety and depression, the ALJ found her mental impairments to be non-severe. Pl.'s Br. 36. Plaintiff contends that the ALJ's findings "failed to reconcile the positive, abnormal findings throughout the record" and a consistent need

to adjust her mental health medications. *Id.* Plaintiff argues, citing to *Hammonds v. Astrue*, No. 1:09-cv-00041, 2010 WL 2133897 (W.D.V.A. May 27, 2010), that the ALJ "failed to consider relevant and material evidence, provide any reasons for his findings as to the severity of impairments, or consider the severe impairments in combination with the non-severe impairments[.]" *Id.* at 37. The Commissioner contends "the ALJ's narrative discussion adequately explained why he found that Plaintiff's mental impairments were non-severe and resulted in no mental RFC limitations." Def.'s Br. 22.

At Step Two of the sequential evaluation process the ALJ evaluated Plaintiff's medically determinable impairments to determine if the impairments were severe or non-severe. Tr. 20. The ALJ determined that Plaintiff's "medically determinable impairment of depression does not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and is therefore non-severe." *Id.* As required by the regulations, the ALJ documented application of the special technique[4] to determine whether Paragraph B criteria were satisfied. Tr. 20-21. Citing to the evidence that included Plaintiff's self-reported activities and consultative examinations, the ALJ found Plaintiff had "no limitation" in the functional areas of understanding, remembering, or applying information and adapting or managing oneself; and "mild limitation" in the functional areas of interacting with others and concentrating, persisting, or maintaining pace. *Id.* The ALJ

---

[4] The regulations provide steps that must be applied in evaluating mental impairments. *See* 20 C.F.R. § 404.1520a. The ALJ must follow a "special technique" to determine the severity of a claimant's mental impairments. 20 C.F.R. § 404.1520a(a). Under the special technique, the ALJ first evaluates the claimant's pertinent symptoms, signs, and laboratory findings to substantiate the presence of a medically determinable mental impairment. *Id.* § 404.1520a(b)(1). Then the ALJ rates the claimant's degree of functional limitation resulting from the impairment. *Id.* § 404.1520a(b)(2). The rating determines whether the claimant's impairment is severe or not severe. *Id.* § 404.1520a(d). The ALJ considers four broad functional areas in order to rate a claimant's degree of functional limitation: (1) understand, remember, or apply information; (2) interact with others; (3) concentrate, persist, or maintain pace; and (4) adapt or manage oneself. *Id.* § 404.1520a(c)(3); *see id.* Pt. 404, Subpt. P, App. 1, § 12.00C.

found that because Plaintiff's "medically determinable mental impairment causes no more than 'mild' limitation in any of the functional areas <u>and</u> the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, it is non-severe (20 CFR 404.1520a(d)(1) and r16.920a(d)(1))." Tr. 21 (emphasis in original).

Step Two is a threshold determination of whether a claimant has a severe impairment (or combination of impairments) that meets the twelve-month duration requirement and significantly limits the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). A severe impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [a claimant's] statement of symptoms[.]" 20 C.F.R. §§ 404.1508, 416.908. It is the claimant's burden to prove that she suffers from a medically severe impairment. *Bowen v. Yuckert*, 482 U.S. at 146 n.5.

Plaintiff argues that "there are times when an ALJ's failure to consider whether an impairment is severe at Step 2 may be harmless. But this situation arises where the ALJ adequately discusses the evidence and limitations related to those impairments later in the sequential evaluation process." Pl.'s Br. 36. That is exactly what the ALJ did in this case—he discussed Plaintiff's mental impairments in his RFC analysis and in his evaluation of the medical opinion evidence. Tr. 24, 26. Furthermore, there is no requirement that a finding of a "mild" difficulty in mental functioning must have a correlating limitation in the RFC assessment. *See, e.g., Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) (noting that "moderate" limitation in concentration, persistence, or pace at step three of the sequential evaluation may not translate into an RFC

21

limitation in every case); *Pavlic v. Saul*, No. 1:19cv146, 2020 WL 1326217, at *2–3 (M.D.N.C. Jan. 14, 2020) (finding no error where ALJ identified "mild" mental limitations in each of the four functional areas, but included no corresponding limitations in the RFC because ALJ sufficiently explained that "the record as a whole," including claimant's treatment, examination findings, and medical opinions, did not support any mental functional limitations)).

Accordingly, the undersigned recommends finding that the ALJ's failure to list Plaintiff's depression as a severe impairment may be considered harmless error. "As long as a claim is not denied at step two, it is generally unnecessary for the ALJ to have specifically found any additional alleged impairment to be severe." *Bryant v. Comm'r, Soc. Sec. Admin.*, No. 2:15-CV-4786-RMG-MGB, 2017 WL 394500, at *9 (D.S.C. Jan. 10, 2017), *report and recommendation adopted sub nom. Bryant v. Colvin*, No. CV 2:15-4786-RMG, 2017 WL 384302 (D.S.C. Jan. 25, 2017)). *See also Martinez v. Astrue*, No. CA 1:11-850-CMC-SVH, 2012 WL 3580675, at *10 (D.S.C. July 30, 2012), *report and recommendation adopted*, No. CA 1:11-850-CMC-SVH, 2012 WL 3582799 (D.S.C. Aug. 17, 2012) ("A finding of a single severe impairment at step two of the sequential evaluation is enough to ensure that the factfinder will progress to step three."). In other words, "[a]s long at the ALJ determines that the claimant has at least one severe impairment and proceeds to discuss all of the medical evidence, any error regarding failure to list a specific impairment as severe at step two is harmless." *McClain v. Colvin*, No. 1:12CV1374, 2014 WL 2167832, at *4 (M.D.N.C. May 23, 2014) (citations omitted).

III.     Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine if the Commissioner's decision as it relates to Plaintiff's fibromyalgia claim is supported by substantial evidence. Accordingly, pursuant to the power of

the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with

remand in Social Security actions, it is recommended that the Commissioner's decision be reversed

and remanded on this issue.

IT IS SO RECOMMENDED.

March 7, 2025                                                Kaymani D. West
Florence, South Carolina                              United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**